No. 22-11132

# United States Court of Appeals for the Fifth Circuit

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

*versus*

TIMOTHY BARTON,

*Defendant-Appellant*,

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:22-CV-2118

**APPELLANT TIMOTHY BARTON'S PETITION FOR PANEL REHEARING (OR, IN THE ALTERNATIVE, MOTION FOR ADDITIONAL STAY PENDING APPEAL) AND MOTION TO ENFORCE STAY**

Michael J. Edney
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue NW
Washington, DC 20037
(202) 955-1500
*medney@huntonak.com*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

STATEMENT OF THE CASE AND BACKGROUND ........ 5

ARGUMENT ........ 9

I. The Court Should Enforce Its Existing Stay and Grant Rehearing to Remove All Ambiguity That the Receiver's Asset-Consuming Activities Are to Stop. ........ 9

II. Whether Entered Through Rehearing or the New Stay Motion, All Four Requirements for the Requested Expanded Stay Are Satisfied. ........ 14

CONCLUSION ........ 18

Certificate of Conference ........ 21

Certificate of Filing and Service ........ 22

Certificate of Compliance ........ 23

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Comer v. Murphy Oil USA, Inc.*,
718 F.3d 460 (5th Cir. 2013) .......... 11

*KeyBank Nat'l Ass'n v. Fleetway Leasing Co.*,
781 F. App'x 119 (3d Cir. 2019) .......... 5, 12

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 18

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 15

*Pfeiffer v. Ajamie PLLC*,
469 F. Supp. 3d 752 (S.D. Tex. 2019) .......... 16

*SEC v. Janvey*,
404 F. Appx. 912 (5th Cir. 2010) .......... 12

*SEC v. Indep. Drilling Corp.*,
595 F.2d 1006 (5th Cir. 1979) .......... 16

*SEC v. Barton*,
72 F.4th 640 (5th Cir. 2023) .......... *passim*

*Texas & N. O. R. Co. v. Bhd. of R. R. Trainmen*,
307 F.2d 151 (5th Cir. 1962) .......... 11

*U.S. v. E. I. du Pont de Nemours & Co.*,
366 U.S. 316 (1961) .......... 10

*Vendo Co. v. Lektro-Vend Corp.*,
434 U.S. 425 (1978) .......... 10

**Rules**

Fed. R. App. P. 8 .......... 1, 4, 12

Fed. R. App. P. 8(a) .......... 14

Fed. R. App. P. 8(a)(2)(A)(i) ........ 14

Fed. R. App. P. 40 ........ 1

Fed. R. App. P. 40(a)(1)(B) ........ 11

Fed. R. App. P. 41 ........ 11

Fed. R. App. P. 41(b) ........ 11

Fed. R. App. P. 41(c) ........ 3

4th Cir. Loc. R. of App. P. 8 ........ 3

## INTRODUCTION

Appellant Timothy Barton respectfully moves this Court to enforce its previously entered stay against continuing and violative Receiver activities. The Appellant also petitions this Court for panel rehearing, pursuant to Federal Rule of Appellate Procedure 40, to expand the scope of its stay pending appeal. As an alternative to rehearing, the Appellant moves this Court for an expanded stay pending appeal under Federal Rule of Appellate Procedure 8.

On July 31, 2023, the Receiver stated that—notwithstanding this Court's stay—he is doing everything but engaging in final closings of sales of real property. Receiver's Fourth Status Report at 7-8. He said he continues to spend estate resources on, among other things, a forensic accounting and lawyer-driven investigation of the Appellant, to negotiate releases of corporate transactional rights to third parties, and to arrange sales of real property just up to the point of closing them. *See, e.g.*, *id.* at 33, 38-39.

That behavior violates this Court's stay. This Court suspended "the receiver's power to sell or dispose of assets belonging to the receivership entities" until this Court's decision vacating the receivership takes effect.

*SEC v. Barton*, 72 F.4th 640, 648 (5th Cir. 2023). The Court provided a narrow carveout for completing sales already approved (*id.*), but the Receiver's wide-ranging continuing activities go well beyond that, touching anything having to do with receivership assets. And it is mowing through the estate's assets with expenses and fees for these activities, which is plainly "dispos[ing] of assets" in violation of the Court's stay. The Court should enforce its existing stay to stop these activities.

To keep going seemingly full speed ahead, the Receiver may be leaning on some perceived ambiguity arising from the Court's denial of a broader stay—which would have halted "activities that go beyond caring for the seized assets." *Id.* The Court should grant panel rehearing of its June 28 decision for the *limited* purpose of granting the broader requested stay. This broader stay is necessary to eliminate the unjustified hairsplitting reflected in the Receiver's July 31 status report.

Rehearing is justified because, contrary to the Court's ruling, the Appellant's request for a broader stay was not moot. The Court found that the Receiver was appointed in error and, therefore, vacated the receivership effective 90 days after issuance of the mandate. *Barton*, 72

F.4th at 646, 648. The Court then partially granted the Appellant's motion for a stay pending appeal, "suspend[ing] the receiver's power to sell or dispose of assets belonging to receivership entities." *Id.* at 648. But the Court denied as moot the Appellant's further request to stay "receivership activities that go beyond caring for the seized assets pending a final decision on the merits.". *Id.*

The issuance of the panel opinion, however, did not moot the request because the Appellant was requesting a stay until a decision on the merits was "final." A panel's order is not considered "final" until the mandate, "which fixes the rights of the parties," issues. Fed. R. App. P. 41(c), 1998 Advisory Committee Note. Any stay pending appeal generally remains in place until issuance of the mandate, so that the effect of the appellate court's final order takes over the minute the stay dissolves. *See, e.g.*, 4th Cir. Loc. R. of App. P. 8 ("stay or injunction pending appeal remains in effect until issuance of the mandate or further order of the Court"). The transition between the stay pending appeal and the merits decision becoming effective is designed to be seamless.

In this case, the Court's decision will not be "final" in any sense relevant to a stay pending appeal until 90 days after the mandate issues.

The Court's June 28 publication of an opinion did not render the stay request moot.

To the extent the Court disagrees and continues to hold that the Appellant did not request a broader stay beyond publication of the merits decision, the Appellant now requests in the alternative an additional Federal Rule of Appellate Procedure 8 stay pending this Court's order vacating the receivership taking effect. The Appellant requests the stay on the same substantive terms as in its prior motion: Permitting the Receiver to retain possession of estate assets but disempowering the Receiver to take actions unrelated to safeguarding them where they stand.

We are grateful for the Court's entirely correct decision that the receivership was imposed illegally, without showings or findings necessary for that "drastic" remedy. The Receiver, however, has just announced he is doing everything he was doing prior to this Court's decision that his appointment was illegal, save for a tiny sliver of activities stayed. But this Court stayed all dispositions—*i.e.,* spending—of assets, save for a tiny sliver of activities permitted. *Barton*, 72 F.4th

at 648. By flipping the stay on its head, the Receiver and the Commission have necessitated this Court's additional intervention.

## STATEMENT OF THE CASE AND BACKGROUND

On June 28, 2023, this panel issued its published opinion, holding the order appointing the Receiver was error and vacating it. *Barton*, 72 F.4th at 648. The decision engaged in a thorough analysis of the high standards the Government must meet to obtain the "drastic" remedy of a receivership. *Id*. at 645-46. The Court then held the District Court erred by not holding the Commission to those high standards. *Id*. at 646. The Court also found error in the lack of analysis—by the Commission or the District Court—of what assets were proper candidates for a receivership. As this Court explained, "[s]ince a receivership's jurisdiction extends only over property subject to the underlying claims, the district court abused its discretion by including all Barton-controlled entities in the receivership without first finding that they had received or benefited from the ill-gotten funds." *Barton*, 72 F.4th at 644.

Following up on a concept raised by Judge Graves at oral argument, the Court implemented a remedy previously used by the Third Circuit. *Barton*, 72 F.4th at 648 (citing *KeyBank Nat'l Ass'n v. Fleetway Leasing*

*Co.*, 781 F. App'x 119, 123 (3d Cir. 2019)). The Court delayed the effect of its order to vacate the receivership until 90 days after the issuance of the mandate. *Barton*, 72 F.4th at 642, 648. This period would give the Commission an opportunity to seek—and the District Court an opportunity to evaluate whether to appoint—"a new receiver" who theoretically could take possession of certain assets from the vacated receivership. *Id.*; Recording of Oral Argument at 12:10-15; 16:48-17:09.

During the time before its ruling vacating the receiverships takes effect, the Court also recognized the continued activities of the illegally appointed receiver would cause irreparable harm. It thus ruled on the Appellant's motion for stay pending appeal, which it had carried with the merits. *Barton*, 72 F.4th at 648. The Court "suspend[ed] the receiver's power to sell or dispose of assets belonging to the receivership entities" "until the receivership order is vacated 90 days from the issuance of this court's mandate." *Barton*, 72 F.4th at 647-48. Perhaps in recognition that stays may only be forward looking and that its vacatur remedy will eliminate historical actions undertaken by the invalidly appointed receiver, the Court excised from its stay "activities in furtherance of sales

or dispositions of property that have already occurred or been approved by the district court." *Id.* at 648.

With regard to the Appellant's request to "stay the receiver's ability to undertake receivership activities that go beyond caring for the seized assets pending a final decision on the merits," the Court held it "now moot since we have reached a final decision on the merits." *Barton*, 72 F.4th at 648.

The Receiver has been entrusted with great authority by the federal court system. Any reasonable steward of that trust would have paused all but those activities essential to protecting the estate's assets, given this Court's ruling that he was improperly appointed and its stay of his authority to consume assets. But not Mr. Thomas, the Receiver appointed in this case. He filed a status report with the District Court on July 31, 2023, making clear that—notwithstanding this Court's opinion and stay—he continues doing everything he did previously. He continues spending estate money investigating the Appellant, running a phalanx of forensic auditors, helping the Commission justify a replacement receiver, finalizing releases of various corporate rights in exchange for payments to the estate, and even preparing to sell real

estate. Receiver's Fourth Status Report at 7-8, 65. The only thing he would abstain from is actually finally closing a sale of real property. To quote the Receiver:

> Until a new receivership order is entered, the Receiver's ability to sell or dispose of property belonging to the Receivership Entities is suspended. However, the Receiver's other duties, obligations, and powers continue in full force in effect. This includes activities in furtherance of sales or disposition of property that have already been approved by the District Court.

*Id.* at pp. 7-8. To give the Court a sense of how much of the estate's assets the Receiver will seek to "dispose of" to pay himself and others for this flurry of activity, one need only turn to his fee requests. As explained in Appellant's motion for stay, his May 15 fee request sought $444,394.22, including hundreds of thousands for his law firm and forensic accountants investigating the Appellant. May 26, 2023, Motion for Stay at p. 16 (ECF No. 84) ("May 26 Motion for Stay"). In a motion filed August 14, the Receiver seeks an additional $437,741.03. *SEC v. Barton, et al.*, ECF No. 300 (N.D. Tex. Aug. 14, 2023).

## ARGUMENT

### I. The Court Should Enforce Its Existing Stay and Grant Rehearing to Remove All Ambiguity That the Receiver's Asset-Consuming Activities Are to Stop.

This Court held that the Receiver's seizure of the Appellant's assets was illegal, explained that his appointment was error, and entered a stay that "suspend[ed] the receiver's power to sell or dispose of assets belonging to receivership entities." *Barton*, 72 F.4th at 647. This Receiver was completely nonplussed and saw the Court's opinion as a reason to put his foot on the accelerator. He is attempting to "dispose of assets belonging to the receivership entities" (*Barton*, 72 F.4th at 647), by using them to pay for an array of activities, as if the day after this Court's order was just another normal day in the office. He says the only thing he must pause is closing a sale of real property; everything else is full speed ahead and he can consume the receivership entities' assets to fund it.

The Court should enforce its stay and make clear that the Receiver simply cannot engage in activities that expend—that is "dispose of"—assets belonging to the Receivership entities. *Barton*, 72 F.4th at 647. And it should further enforce the stay by mandating the return to the receivership estate any expenditures unrelated to maintaining the

property in place, made since this Court's order. This Court is the authority that issued the stay, and it is this Court's prerogative to enforce it. *See U.S. v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 325 (1961); *Vendo Co. v. Lektro-Vend Corp.*, 434 U.S. 425, 427-28 (1978).

The Receiver is attempting to parse through the terms of the stay, claiming maximum authority to spend the greatest amount of resources in the time remaining before his appointment is vacated. To the extent any glimmer of ambiguity is created by the scope of the Court's current stay, the Court should grant rehearing to remove it.

Rehearing is warranted to address the full extent of the Appellant's motion for stay pending appeal, which was carried with the merits. The Appellant requested a halt of the Receiver's activities unrelated to maintaining the property of the estate, in its current condition. The stay sought, in particular, to halt the Receiver's prodigious activities seeking to investigate the Appellant, in assistance of the United States Government.

The Court denied this crucial aspect of the requested stay because it was sought "pending a final decision on the merits," such a decision had been "reached," and the request was therefore "now moot." *Barton*,

72 F.4th at 647-48. The Appellant's request for stay, however, was plainly directed at protecting the status quo prior to this Court's merits decision becoming "final" *by taking effect*. This Court's decisions do not become "final" or have any effect until the mandate issues, making at least what conditions will govern the 53 days after a panel decision very much a live issue. *See* Fed. R. App. P. 40(a)(1)(B) & 41(b) (combining to issue mandate at least 53 days after opinion when a Government agency is a party). After all, the Court retains discretion to alter or amend its decision at any time until the mandate issues. *Comer v. Murphy Oil USA, Inc.*, 718 F.3d 460, 467 (5th Cir. 2013). The Appellate Rules Advisory Committee removed any doubt about the relationship between issuance of the mandate and finality:

> Subdivision (c) . . . provides that the mandate is effective when the court issues it. A court of appeals' judgment or order *is not final until issuance of the mandate*; at that time the parties' obligations become fixed.

Fed. R. App. P. 41 at 1998 Advisory Committee Note (emphasis added). Accordingly, this Court has held that, "*when this Court's mandate issues*, the appeal will no longer be pending and a final order on appeal will have been entered." *Texas & N. O. R. Co. v. Bhd. of R. R. Trainmen*, 307 F.2d 151, 163 (5th Cir. 1962) (emphasis added).

In this case, the Court delayed the decision's taking effect, and "parties' obligations becom[ing] fixed," further—for an additional 90 days after issuance of the mandate. All told, the decision will not take effect for at least 143 days after the June 28 panel decision—until nearly Thanksgiving 2023. This modified remedy—borrowed at the Court's own initiative from the Third Circuit's decision in *KeyBank*—effectively delays when the Court's decision becomes "final." *Barton*, 72 F.4th at 646. The Court's June 28 merits opinion publication did not moot the stay request, *because that decision does not become final* until at least issuance of the mandate and, in this case, beyond.

Indeed, the point of a Rule 8 motion for stay pending appeal is to preserve the status quo until the Court's decision on the merits takes over and preserves the rights of the parties. *See, e.g., SEC v. Janvey*, 404 F. Appx. 912, 916 (5th Cir. 2010). For that reason, the stay turns on a prediction of the relief the merits decision will provide, thus requiring a party to establish a likelihood of success on the merits. *Barton*, 72 F.4th

at 648. That seamless transition between stay and a "final decision on the merits" is what the Appellant was seeking in his stay request.[1]

The Court should therefore grant rehearing for the limited purpose of altering the scope of the stay. It should reverse its ruling that the Appellant's request for a "stay [of the] receiver's ability to undertake receivership activities that go beyond caring for the seized assets" is moot. *Barton*, 72 F.4th at 648. And it should enter the requested stay until the Court's merits decision becomes "final" through taking effect: That is, 90 days after the issuance of the Court's mandate in this case. *Id.*

If the Court were to disagree and continue to hold that the panel opinion's publication mooted the Appellant's broader stay request, the Appellant now moves for such a stay until the panel decision vacating the

[1] The Appellant sought a suspension of the Receiver's power to sell or dispose of corporate assets "until 60 days after a final order on the merits in this Court." May 26 Motion for Stay at p. 10; *Barton*, 72 F.4th at 648. That special, additional, buffer was intended to allow the Appellant to raise with the Court specific objections to those sales going beyond the many defects in the order appointing the Receiver (May 26 Motion for Stay at 7). Both requests keyed off this Court's "order on the merits" becoming "final" by taking effect. *Id.* at 10.

receivership takes effect. *See* Fed. R. App. P. 8(a). For the reasons stated in Section II, the stay is warranted.

The Court may entertain this new request for a stay, because presenting it to the District Court would be impracticable. Fed. R. App. P. 8(a)(2)(A)(i). This Court has already held, given the District Court's dedication to allowing the Receiver to proceed as he wishes, that "moving first in the district court would [be] pointless." *Barton*, 72 F.4th at 648. In addition, the stay request is directed at matters of ambiguity arising from the Court's decision, a matter the Court of Appeals traditionally has retained jurisdiction to clarify.

## II. Whether Entered Through Rehearing or the New Stay Motion, All Four Requirements for the Requested Expanded Stay Are Satisfied.

This Court should "stay the receiver's ability to undertake receivership activities that go beyond caring for the seized assets" (*Barton*, 72 F.4th at 648), until the Court's vacatur order takes effect—90 days after issuance of the mandate. The Court should do so either (i) through granting rehearing, reversing its mootness finding regarding this request, and proceeding to the merits of the request; or (ii) through granting the Appellant's new motion for stay presented here. Granting

the requested stay would prevent further harm caused by the Receiver's unjustified parsing of this Court's current stay.

Each of the criteria for the requested expanded stay is amply met here. *See Barton*, 72 F.4th at 648; *Nken v. Holder*, 556 U.S. 418, 434 (2009) (setting forth the four factors for a stay pending appeal).

First, the Appellant is "likely to succeed on the merits," because he has already prevailed on the merits. *Barton*, 72 F.4th at 648.

Second, the Appellant "will be irreparably injured absent a stay." *Id.* at 648. As an initial matter, this Court already has found that the Appellant would suffer irreparable harm absent a stay of "the receiver's power to sell or dispose of property belonging to receivership entities." *Id.* But the Receiver is interpreting this stay to permit him to do everything and anything but finally closing a new sale of real property. Receiver's Fourth Status Report at pp.7-8. The Receiver does not think he is doing this work for free; he is spending the estate's money to do it. These activities are "dispos[ing] of assets belonging to the receivership entities"—by consuming them through professional fees—just as much as selling an asset. The Court already has held such activity is irreparably harming the Appellant. *Barton*, 72 F.4th at 648.

In any event, to the extent the Receiver spends "assets belonging to receivership entities" on those activities, it will be very difficult for the Appellant or the corporate entities to recover those funds from the Receiver or the Government. *SEC v. Indep. Drilling Corp.*, 595 F.2d 1006, 1008 (5th Cir. 1979) (difficulties in the ability to recover damages later from government-related entities claiming immunity make financial harms irreparable).

Now—after his appointment has been held in error—is also not the time for the Receiver to be rooting through the information and files of the estate and using estate information and resources to assist the Commission. The Receiver's continued handling and manipulation of the corporate entity's information could lead to its loss or improper disclosure to the Government, which itself would be irreparable harm. *Pfeiffer v. Ajamie PLLC*, 469 F. Supp. 3d 752, 764 (S.D. Tex. 2019) (sharing confidential information with third parties constitutes irreparable harm).

Finally, the Receiver even has claimed the ability to release contractual rights that are not strictly speaking the selling of a parcel of real property, notwithstanding the stay. *See, e.g.*, Receiver's Fourth

Status Report at p. 37, 63. Such activities are subject to the current bar on "dispos[ing] of assets," whether they be contractual rights, financial deposits, or real property. *Barton*, 72 F.4th at 647. But if such activities were to continue, these transactions would be difficult to unwind after the fact and would alter the status quo in a way causing irreparable harm. *Id.* at 648.

Third, the stay will not "substantially injure other parties to the proceeding." *Barton*, 72 F.4th at 648. The stay keeps the property in place, pending the effective date of this Court's order vacating the receivership. An open question is whether the Commission will make the showings necessary for a new receivership or other arrangement and, if so, over what portion of the assets. The stay will do nothing to endanger the security of the assets that might be appropriate for that arrangement. Nor can the Commission claim it is harmed by not being able to spend the Appellant's assets to investigate the Appellant. Again, the normal rule in this country is that the Government, if it chooses to investigate or take action against a citizen, uses public funds to do so. It cannot seize the citizen's money first to fund the making of its case.

Fourth and for similar reasons, the "public interest lies" in favor of the requested stay. *Barton*, 72 F.4th at 648. Right now, the Receiver is an illegally appointed institution; his continued activities are in violation of the law; and the public interest is always served by compliance with the law. *See*, *e.g.*, *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

## CONCLUSION

The Receiver is taking a narrow and unjustified view of this Court's stay: The Receiver claims he can do everything except actually close a sale of property and he can spend receivership estate resources to do it. That is not what this Court said: It suspended "the receiver's power to sell or dispose of assets belonging to receivership entities" for any reason except the completion of already approved property sales. *Barton*, 72 F.4th at 648. The Court should enforce the stay to stop the Receiver's violative conduct.

To further ensure a stop to this hairsplitting, the Court should enter the fulsome stay that the Appellate requested in May 2023. That stay would have paused "the receiver's ability to undertake receivership activities that go beyond caring for the seized assets." *Id*. To do so, the

Court should grant rehearing for the limited purpose of reversing its decision that this stay request was mooted by the issuance of the panel decision and then entering the requested stay. To the extent the Court continues to hold that the Appellant did not request this broader stay until the merits order is fully final by taking effect, it should grant the Appellant's new request for such a stay. Whether through rehearing or the new stay request, the expanded stay should remain in place until the order vacating the receivership becomes effective 90 days after issuance of this Court's mandate.

Respectfully submitted,

HUNTON ANDREWS KURTH LLP

*/s/ Michael J. Edney*
Michael J. Edney
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue NW
Washington, DC 20037
(202) 955-1500
*medney@huntonak.com*

ATTORNEYS FOR APPELLANT
TIMOTHY LYNCH BARTON

Date: August 14, 2023

## Certificate of Conference

I hereby certify in accordance with Fifth Circuit Rule 27.4, that on August 10, 2023, I discussed the present motion via e-mail with the SEC's counsel, Ezekiel Hill. I described the terms of the contemplated motion for rehearing or, in the alternative, expanded stay. I also explained the reasoning for such. Mr. Hill indicated via e-mail on August 11 that the SEC has decided to oppose the requested partial stay. Prior to conferring with Mr. Hill, on August 9, 2023, I discussed the present motion, in general terms, with the SEC's counsel, Keefe Bernstein.

*/s/ Michael J. Edney*

## Certificate of Filing and Service

I hereby certify that on August 14, 2023, this document was filed and served in PDF format using the United States Court of Appeals for the Fifth Circuit's CM/ECF system upon all counsel of record, as follows:

Ezekiel L. Hill
hillez@sec.gov
Securities and Exchange Commission
100 F St., N.E.
Washington, DC 20549

Keefe M. Bernstein
bernsteink@sec.gov
James E. Etri
etrij@sec.gov
David B. Reece
reeced@sec.gov
Securities and Exchange Commission
801 Cherry St., Suite 1900
Fort Worth, TX 76102

*Counsel for the Securities and Exchange Commission*

In addition, I further certify that this electronic filing is an exact copy of the paper document and any privacy redactions have been made. This filing has been scanned for viruses and has been found to be free of viruses.

*/s/ Michael J. Edney*

## Certificate of Compliance

I hereby certify that this document complies with the word limit of Fed. R. App. P. 40(b)(1) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), the document contains 3,803 words, as calculated using the word processor used to prepare this document, Microsoft Word for Microsoft 365. I also certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Michael J. Edney*

# Attachment A

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 28, 2023

Lyle W. Cayce
Clerk

No. 22-11132

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff—Appellee*,

*versus*

TIMOTHY BARTON,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:22-CV-2118

Before CLEMENT, GRAVES, and HIGGINSON, *Circuit Judges*.

JAMES E. GRAVES, JR., *Circuit Judge*:

The Securities and Exchange Commission ("SEC") sued Defendant Timothy Barton as well as other individual Defendants and corporate entities for securities violations. Barton appeals the district court's order appointing a receiver over all corporations and entities controlled by him. For the following reasons, we VACATE the order appointing the receiver effective 90 days after the issuance of this court's mandate and REMAND for further proceedings. We also GRANT in part Barton's motion for a partial stay pending appeal.

## I. Background

### a. Factual Background

The SEC alleges the following facts in its complaint. Beginning around 2015, Defendant Haoqiang Fu, a Chinese national, began brokering homes for Defendant Stephen Wall, a Texas-based home builder. After deciding to expand into real estate development projects, they partnered with Barton, a Texas-based real estate developer. Their plan was to offer and sell investment loans to Chinese investors. To effectuate this plan, Barton formed single-purpose entities (the "Wall Entities") to receive and control investor funds, purchase specific parcels of land, and later develop the land into residential housing. After Wall identified the land for projects, Fu marketed the investments to Chinese investors. For each investment contract, the Wall Entity would borrow a fixed amount from investors and use it in conjunction with other investors' funds and money in hand to acquire a specific parcel of land at a specified price. In return, the investors were promised repayment of the principal after two years and interest payments after the first and second year. Between 2017 and 2019, the Wall Entities raised approximately $26.3 million dollars from over 100 investors. However, only two of the nine Wall entities purchased the property described in their respective investment contracts for a total of $2.6 million. Even these purchases were not made using the investor funds earmarked for those properties—instead, the purchases were made using commingled funds from other offerings. In addition, two other entities controlled by Barton (the Relief Defendants) purchased the properties that two Wall entities were supposed to purchase. In all, approximately $23.7 million of the investors' funds were commingled and misused to: 1) pay Barton's personal expenses, 2) pay Fu commissions and fees, 3) make Ponzi payments to the earlier investors, 4) make political contributions, 5) acquire unrelated

properties, 6) pay professional fees for unrelated properties, and 7) make payments to Wall.

**b. Procedural Background**

On September 23, 2022, the SEC sued Barton, Wall, Fu, the Wall Entities, Carnegie Development (the managing member of the Wall entities), and the Relief Defendants for securities violations. The SEC sought a permanent injunction, disgorgement of ill-gotten gains, and civil penalties.

Soon after filing its complaint, the SEC moved to appoint a receiver over the Wall Entities, Carnegie Development, the Relief Defendants, and any other entities that Barton directly or indirectly controls. It supported its motion with a declaration from an SEC Staff Accountant who was involved in the investigation. The declaration details the transfer, commingling, and misuse of the investors' funds. In its motion, the SEC argued that the district court may appoint a receiver on a prima facie showing of fraud and mismanagement based on this court's decision in *SEC v. First Financial Group of Texas*, 645 F.2d 429, 438 (5th Cir. 1981) ("*First Financial*"). Barton opposed the motion, arguing that the district court must instead find that a receivership is appropriate under the factors in *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012).

On October 18, 2022, the district court granted the SEC's motion and appointed a receiver over assets belonging to the Defendant entities, the Relief Defendants, and any other entities directly or indirectly controlled by Barton. It made the following findings in its order:

> the Court finds that, based on the record in these proceedings, the appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets of the Receivership Entities
>
> . . .

Case: 22-11132 Document: 134 Page: 4 Date Filed: 06/14/2023



> the Court finds that the SEC has brought this action to enforce the federal securities laws, in furtherance of the SEC's police and regulatory powers, and the relief sought by the SEC and provided in this Order is in the public interest by preserving the illicit proceeds of fraudulent conduct, penalizing past unlawful conduct and deterring future wrongdoing, and is not in furtherance of a pecuniary purpose, and therefore, the Court concludes that the entry of this Order is excepted from the automatic stay pursuant to 11 U.S.C. §362(b)(4).

The order gave the receiver numerous powers, including the power to determine the nature of the property interests, take possession of any property belonging to receivership entities, and take any actions necessary to preserve receivership property or prevent its dissipation, concealment, or inequitable distribution.

Barton moved to strike the clause allowing the receiver to take possession of assets belonging to "any other entities that Defendant Timothy Barton directly or indirectly controls." The district court denied his motion. On November 1, 2022, the receiver moved for the district court to supplement its receivership order to include over a hundred newly discovered Barton-controlled entities by name. The district court supplemented its order *nunc pro tunc* to expressly identify 126 newly discovered receivership entities. The receiver then moved for the court to set procedures for the disposition of personal property in the custody of receivership entities. The district court granted the motion and adopted the procedures proposed by the receiver. Barton timely appealed the order appointing the receiver and both follow-up orders. On November 28, 2022, he moved in the district court for a stay pending appeal of the receivership order. While that motion was still pending, he also asked this court for a stay pending appeal. A motions panel of this court denied his request on January 6, 2023, and the district court denied his request on January 17, 2023.

## II. Jurisdiction & Standard of Review

We have jurisdiction over interlocutory appeals from "orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property." 28 U.S.C. § 1292(a)(2). We review a district court's decision to appoint a receiver for abuse of discretion. *Netsphere*, 703 F.3d at 305.

## III. Discussion

### a. The Applicable Test

A central dispute between the parties is what test the district court should have applied before imposing a receivership. Barton argues the district court abused its discretion because it did not apply the standard or make the proper findings under the factors set forth in *Netsphere* ("*Netsphere* factors"). The SEC responds that *Netsphere* is inapplicable and the district court's findings were sufficient under *First Financial*.

In *First Financial*, the SEC sued a securities dealer and its officers for securities violations. 645 F.2d at 431. The district court granted the SEC's motion for a preliminary injunction and enjoined each individual defendant "from offering, purchasing, or selling packages of the specified securities in violation of the federal securities laws, and from disposing of assets and records of First Financial." *Id.* at 432. It also enjoined the defendants from disposing of more than $1,500 in personal assets per week. *Id.* Twelve days later, it granted the SEC's motion for a temporary receiver over the defendant entity, First Financial. *Id.* The order directed the receiver "to take exclusive control of the corporate assets in order to prevent injury to First Financial investors and to prevent further violations of the federal securities laws." *Id.* at 437-38. Reviewing the injunction order, this court first explained that under the relevant securities laws, preliminary injunctive relief is

appropriate upon a showing of "a reasonable likelihood that the defendant is engaged or about to engage in practices that violate the federal securities laws." *Id.* at 434. It concluded that the district court did not abuse its discretion in entering a preliminary injunction. *Id.* at 436. Turning to the district court's appointment of a receiver, it cited a Seventh Circuit case for the following proposition:

> The prima facie showing of fraud and mismanagement, absent insolvency, is enough to call into play the equitable powers of the court. It is hardly conceivable that the trial court should have permitted those who were enjoined from fraudulent misconduct to continue in control of (the corporate defendant's) affairs for the benefit of those shown to have been defrauded. In such cases the appointment of a trustee-receiver becomes a necessary implementation of injunctive relief.

*Id.* at 438 (quoting *SEC v. Keller Corp.*, 323 F.2d 397, 403 (7th Cir. 1963)). To protect the public welfare and the interests of those who invested with First Financial, this court concluded that the "appointment of a receiver was a necessary relief measure within the discretion of the court, as an ancillary to preliminary injunctive relief during the continuing civil enforcement proceeding." *Id.* at 439.

The SEC relied upon *First Financial* in both its briefing before the district court and this court, but there is a crucial distinction between that case and the receivership order here. There, the SEC already obtained injunctive relief, so the receivership was "proper as an adjunct to injunctive relief for a securities fraud." *Netsphere*, 703 F.3d at 306 (citing *Keller*, 323 F.2d at 402); *see also Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985) ("Courts possess the inherent authority to enforce their own injunctive decrees.") (citation omitted). Here, the SEC did not obtain a preliminary injunction before seeking a receivership, so *First Financial* is inapposite.

That brings us back to *Netsphere*. In that case, a defendant was involved in disputes over the ownership of domain names. *Netsphere*, 703 F.3d at 302. After settling those domain name disputes in related bankruptcy proceedings, the bankruptcy court recommended the appointment of a special master to mediate unpaid legal fees since the defendant kept hiring and firing lawyers without paying them. *Id.* at 303. The district court appointed a special master, but the defendant went on to fire another attorney. *Id.* at 304. The bankruptcy trustee then filed an emergency motion to appoint a receiver, which the district court granted. *Id.*

Before discussing the propriety of the receivership, this court began by noting that a "[r]eceivership is 'an extraordinary remedy that should be employed with the utmost caution' and is justified only where there is a clear necessity to protect a party's interest in property, legal and less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties." *Id.* at 305 (citing 12 C. Wright & A. Miller, Federal Practice and Procedure § 2983 (3d ed. 2012)). It catalogued the various contexts where receiverships are used, including "cases of non-compliance with SEC regulations, [where] a receiver may be appointed to prevent the corporation from dissipating corporate assets and to pay defrauded investors." *Id.* at 306. Turning to the facts of the case at hand, it found that none of the purported justifications supported the imposition of a receivership. *Id.* at 307-11.

Since the SEC had not already obtained an injunction against Barton when the SEC moved for a receivership, *First Financial* does not control and instead, the *Netsphere* factors must be met for a receivership to be justified: 1) a clear necessity to protect the defrauded investors' interest in property, 2) legal and less drastic equitable remedies are inadequate, and 3) the benefits of receivership outweigh the burdens on the affected parties. *See id.* at 305.

**b. The Propriety of the Receivership**

Having concluded that *Netsphere* applies, we consider whether the district court abused its discretion. In its order, the district court justified appointing a receiver by stating it "is necessary and appropriate for the purposes of marshaling and preserving all assets of the Receivership Entities" and would be "in the public interest by preserving illicit proceeds of fraudulent conduct, [and] penalizing past unlawful conduct and deterring future wrongdoing." Even assuming that these findings could satisfy the first *Netsphere* factor, the order does not address whether legal and less drastic equitable remedies are inadequate or whether the benefits of the receivership outweigh the burdens on the affected parties. *Netsphere*, 703 F.3d at 305.

For the latter two factors, the SEC asks us to consider the district court's reasoning in its order denying Barton's motion for a stay that was filed after this appeal was lodged. In its brief, it provided no authority for the proposition that we can look to a subsequent order denying a separate motion when reviewing an earlier order. However, at oral argument, SEC's counsel claimed we can do so under the exception for actions in aid of an appeal in *Silverthorne v. Laird*, 460 F.2d 1175, 1178 (5th Cir. 1972). "This circuit follows the general rule that the filing of a valid notice of appeal from a final order of the district court divests that court of jurisdiction to act on the matters involved in the appeal, except to aid the appeal, correct clerical errors, or enforce its judgment so long as the judgment has not been stayed or superseded." *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 928 (5th Cir. 1983). In *Silverthorne*, the district court denied habeas relief, and the petitioner appealed. 460 F.2d at 1178. During the pendency of the appeal, the district court issued a written opinion "in which he thoroughly discussed the rationale in support of his earlier order denying habeas corpus relief." *Id.* This court found that the written opinion's amplified views aided the appeal, so it fell under that exception. *Id.* at 1178-79. Unlike *Silverthorne*,

the order the SEC asks us to consider is not a fuller explanation of the earlier order granting a receivership—it is a denial of a separate motion. Further, as Barton points out, the district court's order denying the stay discussed events and actions that took place *after* the receivership was already in place. "'Meaningful appellate review of the exercise of discretion requires consideration of the basis on which the trial court acted.'" *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 310 n.4 (5th Cir. 2008) (en banc) (quoting *Gurmankin v. Costanzo*, 626 F.2d 1115, 1119–20 (3d Cir. 1980)). The reasoning in the subsequent order goes beyond the basis on which the district court originally acted, and *Silverthorne* does not give us license to consider it.

Constraining our review to the district court's limited reasoning in its original order, we cannot say whether it abused its discretion. *See Gonzalez v. Assocs. Health & Welfare Plan*, 55 F. App'x 717 (5th Cir. 2002) ("Although we cannot say the court abused its discretion by denying prejudgment interest, the district court's failure to explain its reasoning frustrates meaningful appellate review."). Accordingly, we will vacate the appointment of the receiver and remand so that the district court may consider whether to appoint a new receivership under the *Netsphere* factors. When faced with a similar situation, the Third Circuit opted to delay vacatur of the receivership instead of vacating it immediately. *See KeyBank Nat'l Ass'n v. Fleetway Leasing Co.*, 781 F. App'x 119, 123 (3d Cir. 2019). We find the Third Circuit's approach prudent here given the breadth of the receivership and the possibility that a new receivership would cover some of the same entities. Thus, we will vacate the current receivership order effective 90 days from the issuance of this court's mandate.

### c. The Receivership's Jurisdiction

Barton next argues that the district court erred by placing multiple entities he controls in the receivership without any showing that they

received or benefitted from ill-gotten investor funds. The SEC responds that the district court acted within its discretion by including all Barton-controlled entities in the receivership. Because it alleges that Barton has engaged in extensive commingling of funds, it claims that Barton's control is an effective proxy for placing an entity in the receivership even if it had not yet traced the funds to that entity.

In *Netsphere*, this court rejected the district court's determination that a receivership was necessary for the defendant to pay his debts to former attorneys because "the jurisdictional principle that a court's equitable powers do not extend to property unrelated to the underlying litigation applies with equal force to receiverships. A court lacks jurisdiction to impose a receivership over property that is not the subject of an underlying claim or controversy." 703 F.3d at 310. In support, it cited *Cochrane v. W.F. Potts Son & Co.* where this court held that a receivership was proper only over the series of bonds subject to litigation, not the other series of bonds that were not subject to the complaint and over which the bondholder did not claim an interest. *Id.* (citing *Cochrane v. W.F. Potts Son & Co.*, 47 F.2d 1026, 1027-29 (5th Cir. 1931)). Accordingly, *Netsphere* held that the district court could not impose a receivership over the plaintiff's personal property or assets owned by certain entities because those assets were not sought in or the subject of the underlying litigation. *Id.*

The SEC relies on *FDIC v. Faulkner* to support the district court's inclusion of all Barton-controlled entities in the receivership regardless of whether they received or benefitted from ill-gotten funds. 991 F.2d 262, 267-68 (5th Cir. 1993). In *Faulkner*, the defendants allegedly engaged in fraudulent real estate speculation schemes. *Id.* at 264. The FDIC sought a preliminary injunction against the defendants to limit their ability to transfer assets, and the district court granted it. *Id.* On appeal, the defendants argued that the injunction was too broad since it froze assets that were not obtained

through alleged fraudulent activities. *Id.* at 267. Since the defendants refused to aid the district court in determining which of the assets were traceable to the alleged fraud, this court held that the district court "did not err in freezing all of the [defendant's] assets, pending a determination through limited discovery of which assets are traceable to [defendant's] alleged fraudulent activities." *Id.* at 268.

*Faulkner* does not support the district court's actions here. Under *Faulkner*, the SEC could have sought an injunction freezing asset transfers while it traced the funds and determined which entities should be placed in the receivership. But it did not. Since a receivership's jurisdiction extends only over property subject to the underlying claims, the district court abused its discretion by including all Barton-controlled entities in the receivership without first finding that they had received or benefited from the ill-gotten funds. *Netsphere*, 703 F.3d at 310. Should the district court decide that a new receivership is justified on remand, it can only extend over entities that received or benefitted from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation.

**d. Stay Pending Appeal**

After oral argument, Barton moved for a partial stay of certain receivership activities pending appeal. He asked this court to: 1) order the receiver to retain possession of all corporations and corporate property pending a final decision on the merits, 2) suspend the receiver's power to sell or dispose of assets belonging to receivership entities until 60 days after a final opinion on the merits from this court, and 3) stay the receiver's ability to undertake receivership activities that go beyond caring for the seized assets pending a final decision on the merits. Barton also sought emergency relief from the transfer of one of the receivership entity's possessory interests in a

particular property. We denied his emergency request as moot but carried the remainder of his motion with the case.

At the outset, the SEC challenges whether Barton's motion complies with Federal Rule of Appellate Procedure 8. Under Rule 8, stay motions ordinarily must first be presented to the district court "unless it clearly appears that further arguments in support of the stay would be pointless in the district court." *Ruiz v. Estelle*, 650 F.2d 555, 567 (5th Cir. 1981). The district court denied Barton's initial motion for a stay pending appeal. When Barton sought to preliminarily enjoin the receiver's auction of contents of a particular receivership property, the district court denied his request explaining that "[Barton's motion] requests the same relief, and on the same grounds, that the Court has already denied multiple times, and the Fifth Circuit has already denied once: a stay of the Receiver's activities pending appeal or final judgment." Given the clear indication that the district court would have denied this motion, we find that Barton's motion satisfies Rule 8 because moving first in the district court would have been pointless. *Id.*

Barton's first and third requests are now moot since we have reached a final decision on the merits. However, his second request is not moot because it seeks relief that extends 60 days beyond the issuance of a final decision. For his second request, we consider four factors in deciding whether to grant a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (internal quotation marks and citation omitted). In light of our vacatur of the receivership order, we conclude that Barton has made the proper showing under the factors and is entitled to a partial stay.

## IV. Conclusion

For the foregoing reasons, we VACATE the district court's order appointing a receiver effective 90 days from the issuance of this court's mandate and REMAND for further proceedings consistent with this opinion. We also GRANT in part Barton's motion for a partial stay pending appeal: the receiver's power to sell or dispose of property belonging to receivership entities is immediately suspended, and this suspension will remain in effect until the receivership order is vacated 90 days from the issuance of this court's mandate. This suspension does not apply to activities in furtherance of sales or dispositions of property that have already occurred or been approved by the district court. Should the district court enter a new receivership order before the present order is vacated, this partial stay has no bearing on any actions a receiver may take under the new order.

# Attachment B

back to the district court for further proceedings. The Fifth Circuit also suspended the Receiver's ability to sell or dispose of any property not previously approved by the Court; however, the court expressly authorized the Receiver to engage in "activities in furtherance of sales or dispositions of property that have already occurred or been approved by the district court."

On July 5, 2023, the District Court entered an order noting the Fifth Circuit's remand for further proceedings and directing the SEC and Barton, in the interest of expediency, to meet and confer and inform the Court whether they would agree to proceed before a mandate issues from the Fifth Circuit. On July 12, 2023, the parties submitted a joint status report in which the SEC indicated that they were willing to proceed before the mandate issued but Barton indicated that he was not willing to so proceed. On July 16, 2023, the District Court entered an order (a) stating that because the parties did not consent to proceed before the mandate issues, the Court lacked jurisdiction to order the parties to proceed; (b) indicating that once the mandate issues, the Court intends to order the SEC to move for appointment of a receiver; and (c) noting that, consistent with the Fifth Circuit's opinion, the Court will require the SECs motion to (1) request appointment of a receiver under the factors set out in *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012); (2) request injunctive relief; and (3) provide a basis for the inclusion of entities in the receivership that complies with the Fifth Circuits standard, *i.e.*, that limits the receivership to entities that received or benefitted from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation." Finally, the Court indicated that the SEC's motion will be due within one week of the Fifth Circuit's mandate issuing and that it will set a briefing schedule after issuance of the mandate.

Until a new receivership order is entered, the Receiver's ability to sell or dispose of property belonging to the Receivership Entities is suspended. However, the Receiver's other

duties, obligations, and powers continue in full force in effect. This includes activities in furtherance of sales or disposition of property that have already been approved by the District Court. If the District Court does not enter a new receivership order prior to 90-days after the Fifth Circuit's mandate issues (roughly mid-November 2023), then the October 2022 Receivership Order will be vacated and the Receiver's authority under that order will cease. If the District Court enters a new receivership order before that time, the partial stay of the receivership's ability to sell or dispose of property will have no bearing going forward.

**6. Other Dismissed and Pending Appeals**

In addition to the main appeal of the Receivership Order, Defendant Barton and others have filed appeals of other orders granting motions filed by the Receiver.[1] These other appeals include the following:

On December 21, 2022, Defendant Barton filed a Notice of Appeal of the Rock Creek Sale Order. Case No. 22-11226. On June 19, 2023, the Fifth Circuit entered an Order dismissing the appeal. This appeal and the status of the Rock Creek Sale are discussed further below.

On December 23, 2022, Defendant Barton filed a Notice of Appeal of the District Court's Order Granting the Receiver's Motion to Ratify Agreement with DLP Capital and Other DLP Entities. Case No. 22-11242. Briefing is fully ripe on this appeal, and it is tentatively scheduled for oral argument for the week of October 2, 2023.

On January 12, 2023, Max Barton filed a Notice of Appeal of the Second Supplemental Order. Case No. 23-10046. As of the filing of this Report, briefing is fully ripe, but oral argument has not yet been granted or set.

[1] As discussed below, Barton opposed the Receiver's request that the appellate docket reflect the Receiver as an appellee or other real party in interest, despite the order on appeal having been issued based on the Receiver's motion. Accordingly, the Receiver has sought to be heard in those appeals as an amicus.

Receiver is unable to sell or otherwise dispose of this property until a new Receivership Order is entered.

**9. Hall Property**

The Court's December 13, 2022, Second Supplemental Order clarified that TC Hall, LLC is a Receivership Entity controlled by Defendant Barton. Once against Max Barton's appeal of the Second Supplemental Order is pending. Receivership Entity TC Hall, LLC owns approximately 0.5 acres of raw land located at 3407 & 3409 Hall Street in Dallas, Texas (the "Hall Property"). Substantial debt exists on this property.

During the Second Quarter of 2023, the Receiver's brokers listed the Hall Property for sale at a price of $6 million. In light of the Fifth Circuit's opinion, the Receiver's efforts to sell this property have been paused. As of the date of this Report, the Receiver is unable to sell or otherwise dispose of this property until a new Receivership Order is entered.

**10. Other Potential Real Estate Assets**

As outlined further below and in the Receiver's Motion to Compel (which was filed in January 2023 and granted during the Second Quarter of 2023), Defendant Barton still has not provided the overwhelming majority of the information required by the Receivership Order, including a list of properties owned by the Receivership Entities. While the Receiver has endeavored to identify separately all properties owned by the Receivership Entities, he has reason to believe other properties owned, either directly or indirectly, by Defendant Barton exist. The Receiver's investigation is ongoing.

**C. Other Identified Assets of the Receivership.**

Although subject to his on-going investigation, the Receiver believes the following assets may be additional sources of recovery for the receivership:

Although the Receiver's accountants still have not completed their forensic accounting, it appears that the majority of the above-described funds flowed into a bank account held at Texas Brand Bank in the name of Receivership Entity Broadview Holdings LLC.[8]

Certain Receivership Entities maintained participation interests of varying percentages with regard to some but not all of the above-referenced property sales (e.g., the Receiver does not believe a participation agreement exists for AVG West, LLC). The Receiver is still investigating and analyzing potential value of participation interests related to the Killeen and San Antonio properties. While it is impossible to predict the value these contractual interests may ultimately generate for the Receivership Estate, the Receiver is optimistic that some value will be realized.

Ratification of DLP Settlement. As detailed more fully in the Receiver's Verified Motion to Ratify Agreement with DLP Capital and Other Entities [Dkt. 95], the Receivership Entities sold certain properties in Fort Worth (Orchard Farms and the Mansions at Marine Creek) and Florida (Winter Haven) to DLP Capital in late 2021. As part of these transactions, the Receivership Entities (1) received several million dollars over a period of months, (2) transferred title to the properties, and (3) as to each of the Fort Worth properties, entered into a Construction Agreement, a Development Agreement, and a Participation Agreement. On October 18, 2022, the same day that the Receiver was appointed, DLP Capital sent default notices to the Receivership Entities regarding their obligations under the Construction Agreement and Development Agreement. After a meeting between counsel and protracted settlement negotiations, the Receiver and DLP Capital eventually agreed to a mutual release of claims and a payment of $750,000 from DLP Capital to the Receivership. Although the Receivership Order specifies that the Receiver does not need Court

[8] A bank statement from September 2022 indicates that over $100,000 in Receivership Entity funds were transferred from the Broadview Holdings Account to Defendant Barton's law firms. .

*No new updates from Second Quarter of 2023.*

**Other Pending Litigation Matters**

34. *JMJAV v. Elite Jet*, No. 017-333443-22 (17th District Court, Tarrant County)

Plaintiff initiated this lawsuit asserting that defendants failed to provide reasonable estimates and overcharged Plaintiffs for work done to Plaintiff's Learjet 55. Plaintiff refused to pay for the excess charges and in return defendant refused to release the aircraft, associated log books, and other documentation pertaining to the aircraft. Defendant filed counterclaims against Plaintiff and Tim Barton, as a third party, based on suit on a sworn account, breach of contract, and unjust enrichment.

*No new updates from Second Quarter of 2023.*

35. *In Re: FM 544 Park Vista, Ltd. and Pavist, LLC*, No. 17-34255-SGJ-11/17-34274-SJG-11 (US Bk Ct, ND Dallas Division); *on appeal*, *JMJ Development, LLC, et al. v. Roger Sefzik, et al.*, No. 3:22-cv-02254-L (N.D. Tex.)

Dispute arose between Tim Barton, JMJ and TRTX, and Debtor FM 544, Debtor Pavist in connection with the ownership and development of certain real property, consisting of approximately 31.159 acres located in Plano, Collin County, Texas. The Court entered a Chapter 11 reorganization plan which became final in September 2018. As part of the plan, the parties agreed to release certain claims and not sue based on those claims. JMJ and TRTX filed a lawsuit against debtors in this case, and others, in violation of the Court's order. In response, the Court entered an injunction and contempt order against JMJ, TRTX, Tim Barton and the responsible attorneys (the "contemnors"). On October 4, 2022 the contemnors filed an appeal, which has been docketed but no other action has been taken.

*No new updates from Second Quarter of 2023.*

## V.
## PROPOSED PLAN FOR ADMINISTERING THE RECEIVERSHIP

The next immediate steps for administration of the Receivership, pending entrance of a new receivership order, include finalizing previously approved sales and completing the forensic accounting. If and when the Court enters a new Receivership Order, the Receiver's next steps will also include (1) continuing to secure and maintain the assets of the Receivership, including, liquidating assets of the Receivership where necessary to preserve and maximize their value; (2) performing a forensic accounting of the Receivership's bank accounts to (a) determining the amount of monies flowing into the Wall Entities from investors, (b) trace where those monies ultimately flowed, and (c) identify potential fraudulent transfers and transferees; and (3) completing the identification of investors in the Wall Entities.

The forensic accounting will greatly aid the Receiver in determining whether the Receivership Estate has other assets that have not yet been discovered. Because the Receiver has received limited information from Defendant Barton to date, the forensic accounting will likely be the best means of determining where investor monies flowed.

## VI.
## RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP

This is the fourth report from the Receiver and extensive work still remains. More specifically, while observing the stay imposed by the Fifth Circuit, and assuming this Court enters a new Receivership Order, the Receiver intends to (1) continue securing, maintaining, and selling assets; (2) continue pursuing potential fraudulent conveyances; (3) continue investigating potential damages claims against third parties; (4) petition the Court to establish an investor and creditor claims process; and, (5) upon a determination of liability, agreement of Defendants, or further order of this Court, eventually make distributions pursuant to a Court-approved distribution plan. Accordingly, the Receiver recommends that the Receivership continue.

# Attachment C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | **No. 3:22-cv-2118-X** |
| | § | |
| **TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, HAOQIANG FU (A/K/A MICHAEL FU), STEPHEN T. WALL,** | § | |
| | § | |
| ***Defendants,*** | § | |
| | § | |
| **DJD LAND PARTNERS, LLC, and LDG001, LLC,** | § | |
| | § | |
| ***Relief Defendants.*** | § | |

**RECEIVER'S PARTIALLY UNOPPOSED**
**THIRD QUARTERLY FEE APPLICATION**

Pursuant to the Order Appointing Receiver [Dkt. 29] (the "Receivership Order" or "RO") entered by the Court on October 18, 2022, the Receiver is required to submit quarterly fee applications for authorization to pay the fees and expenses incurred by the Receiver and all personnel hired by the Receiver, including counsel to the Receiver. In accordance with the Receivership Order, the Receiver has provided the Securities and Exchange Commission (the "Commission") a complete copy of the proposed Application, together with all exhibits and

relevant billing information. The Commission has indicated that it does not object to the relief sought in the application, with the exception of the 20% holdback discussed below. Defendant Barton has indicated that he is opposed to this Application. Defendants Fu and Wall have not indicated whether they are opposed to the relief requested herein.

This Third Quarterly Fee Application covers April 1, 2023 through June 30, 2023.

## I.
## FEES AND EXPENSES INCURRED

### A. SFAR

A copy of the Standardized Fund Accounting Report for the period April 1, 2023 through June 30, 2023 is attached as **Exhibit A**.

### B. Receiver Fees & Expenses ($81,283.19).

Fees. By this Second Quarterly Fee Application, the Receiver requests authority to pay $69,363.50 in Receiver fees incurred from April 1, 2023 through June 30, 2023. The Receiver provided 208.4 hours of service to the Receivership during this period, which, if the Receiver were to bill at his standard hourly rate, would otherwise result in a bill of $114,620.[1]

Moreover, the Receiver has also voluntarily reduced or otherwise written-off portions of his work on top of the steeply discounted hourly rate. For example, the Receiver has written off the entirety of his time related to drafting the prior quarter's fee application, bi-weekly meetings with the Amerigold property manager to drop off paychecks, and regular maintenance of the extensive email and correspondence generated by the Receivership, among other things. This resulted in write-offs of 25.4 total hours ($9,779 in savings) that would have otherwise been billed to the Receivership Estate. The Receiver also reduced his rate from $385 per hour to $200 per

[1] The Receiver's discounted hourly rate for this matter is $385 per hour. Mr. Thomas' regular billing rate for non-receivership matters is $550 per hour (a discount of 30%).

hour for certain work that he needed to undertake but that ordinarily could otherwise be performed by a less expensive member of his team. This work included meetings at 2999 Turtle Creek, as well as lengthy internal meetings with counsel, totaling 5.9 hours at the reduced rate ($1,091.50 in savings).

The Receiver's application of a steeply reduced hourly rate and the other reductions and write-offs should not be interpreted as implying that the Receiver's work that is the subject of these reductions had no or little value, was in any manner subject to an objection, or otherwise not worthy of reasonable compensation. To the contrary, the Receiver believes that most attorneys or receivers would charge for these services and not agree to such steep discounting. Instead, these voluntary, steep reductions reflect the Receiver's concern for the investors and other creditors impacted by this Receivership, and his desire to minimize the administrative expense to the Receivership where appropriate, among other things. Defendant Barton's continuing practice of challenging many of the Receiver's efforts during the Second Quarter of 2023 has once again necessitated significant time and attention by both the Receiver and, more predominantly, his counsel.

The services provided by the Receiver from April 1, 2023 through June 30, 2023, as well as itemized reductions and write-offs, are set forth in the invoices attached hereto as **Exhibit B**. Where appropriate, the Receiver has redacted privileged information and information that is likely to prejudice the Receivership if publicly disclosed at this time. If the Court desires, the Receiver will submit unredacted copies of this and prior invoices for *in camera* review. The services are also summarized in the Receiver's Fourth Status Report [Dkt. 299], which was filed on July 31, 2023.

Expenses. In addition, to assist the Receivership Estate, the Receiver incurred expenses in the amount of $11,919.69 between April 1, 2023 through June 30, 2023. *See* Ex. B at 5-6. These expenses included moving costs related to the movement of documents from 2999 Turtle Creek to the Receivership's storage units, entity-related searches with the Texas Secretary of State, PACER fees, and postage fees for mail forwarding, among other things. The Receiver did not seek reimbursement for any mileage fees.

In sum, pursuant to the Receivership Order, the Receiver seeks authority to pay a total of $81,283.19 in Receiver fees and expenses incurred during the Second Quarter of 2023.

**C. Receiver's Counsel Fees and Expenses ($208,628.50).**

Fees. The law firm of Brown Fox PLLC ("Brown Fox") serves as primary counsel for the Receiver. By this Application and pursuant to the Receivership Order, the Receiver requests authority to pay Brown Fox $208,628.50 in non-receiver fees billed for work by Brown Fox from April 1, 2023 through June 30, 2023.

The attorneys and paralegals of Brown Fox who provided services to the Receiver during this period, their billable rates, and the hours billed are summarized as follows:

| Attorney/Paralegal | Hours Billed | Discounted Billable Rate | Total Billed |
|---|---|---|---|
| Charlene Koonce (Partner) | 281.4 | $385 | $108,339.00 |
| Margaret Mead (Partner) | .30 | $385 | $115.50 |
| Tim Wells (Associate) | 363.7 | $200 | $65,494.00 |
| Alan Carrillo (Associate) | 92 | $300 | $26,100.00 |
| Shannon Latham (Paralegal) | 35 | $110 | $3,850.00 |
| Joshua Mahaffey (Associate) | 17.2 | $275 | $4,730.00 |
| TOTALS: (blended rate) | 789.60 | | $208,628.50 |

Similar to the Receiver, the attorneys representing the Receiver have agreed to steeply discounted hourly rates in this matter. Moreover, the Receiver's counsel has also agreed to write-offs of time incurred during the Second Quarter of 2023. The Receiver and his primary attorney, Charlene Koonce, have continued to strive to pass along any work that did not merit their expertise to less-expensive associates or paralegals. This has continued to result in substantial work by associate Tim Wells in particular. For certain tasks performed by Mr. Wells, Brown Fox has further agreed to reduce his hourly rate to that of a paralegal ($110 total) for certain tasks that either took longer than anticipated or that did not justify billing at Mr. Wells' full hourly rate. These rate write-downs resulted in savings to the Receivership of Brown Fox has agreed to write-down approximately 61.4 hours of Mr. Wells' time from the Second Quarter of 2023 ($5,526 in savings), the vast majority of which involved coordinating the movement of documents from 2999 Turtle Creek to the Receivership's storage facilities. Brown Fox has also agreed to write-off the entirety of 13.6 hours of associate work during the Second Quarter of 2023 attending a mediation and other miscellaneous receivership items ($3,220 in savings). Once again, these reductions and write-offs are not a reflection of the work that was performed and should in no way minimize or call into question any of the work performed by the Receiver's counsel. To the contrary, the Receiver and his team are seeking to minimize the expense to the Receivership Estate where possible.[2]

Brown Fox provided valuable services to the Receiver during the Second Quarter of 2023. A description of these services is set forth in the invoices attached hereto as **Exhibit C**. Where

[2] Defendant Barton has previously complained of the Receiver's efforts in connection with Barton's appeal of several of the Court's Orders to the Fifth Circuit. Because these appeals stem from motions filed by the Receiver and because there was uncertainty whether the SEC would dedicate Agency resources to defending the resulting Orders, the Receiver believes that his efforts were necessary and reasonable.

appropriate, the Receiver has redacted privileged information and information that is likely to prejudice the Receivership if publicly disclosed at this time. If the Court desires, the Receiver will submit unredacted copies of this and prior invoices for *in camera* review. The services are also summarized in the Receiver's Fourth Status Report [Dkt. 299], which was filed on July 31, 2023.

Expenses. Brown Fox did not incur any separate non-receiver expenses during the Second Quarter of 2023.

In sum, pursuant to the Receivership Order, the Receiver seeks authority to reimburse Brown Fox the total of $208,628.50 for fees and expenses incurred between April 1, 2023 through June 30, 2023.

### D. Receiver's Accountant Fees and Expenses ($137,937.98).

The accounting firm of Ahuja & Clark, PLLC ("Ahuja & Clark") serves as the Receiver's accountants. Ahuja & Clark submitted the invoice attached hereto as **Exhibit D** for the accounting services rendered during the period from April 1, 2023 through June 30, 2023. During the Second Quarter of 2023, the accountants logged 577.60 labor hours for $116,303.00 in fees to the Receivership Estate.

As detailed more fully in the Receiver's Fourth Status Report [Dkt. 299], the Accountants' efforts during the Second Quarter of 2023 related to examination of the miscellaneous QuickBooks files and tax documents obtained by the Receiver, preparing certain Receivership tax filings, and beginning a forensic accounting to determine funds received by the Receivership Entities and identify potential fraudulent transferees, among other things. The Receiver's accountants have additionally voluntarily agreed to write-off an additional $10,707.00 related to internal discussions and background information on the various Receivership Entities.

Expenses. In addition, to assist the Receivership Estate, Ahuja & Clark incurred expenses in the amount of $21,634.98 between April 1, 2023 through June 30, 2023. *See* Ex. E at 2, 4.

These expenses included fees to QuickBooks for certain online accounts and software fees in conjunction with the forensic accounting.

Pursuant to the Receivership Order, the Receiver seeks authority to pay Ahuja &Clark the total of $137,937.98 for fees and expenses incurred during the Second Quarter of 2023.

**E. <u>Veracity's Fees and Expenses ($9,891.36)</u>.**

The Receiver retained Veracity Forensics ("Veracity") to assist in securing the various digital assets located at 2999 Turtle Creek and with establishing the Receivership Website. Veracity submitted the invoices attached hereto as **<u>Exhibit E</u>** for fees and expenses rendered during the period from April 1, 2023 through June 30, 2023. These services included creating forensic images of additional digital assets recovered at 2999 Turtle Creek, storage of devices and images, and imaging of certain online servers the Receiver gained access to during the Second Quarter of 2023.

Pursuant to the Receivership Order, the Receiver seeks authority to pay Veracity the total of $9,892.36 for fees and expenses incurred during the Second Quarter of 2023.

* * * *

Based on the foregoing, the Receiver believes the services rendered to the Receivership by the Receiver, the Receiver's law firm Brown Fox, the Receiver's accountant Ahuja & Clark, and the Receiver's IT Professional Veracity were valuable and that the rates charged to the Receivership were fair and reasonable. Moreover, the expenses incurred for the Receivership were also reasonable and necessary. As of the filing of this Application, the Receiver has not yet closed on the previously approved sales of the Frisco, Amerigold, and Rock Creek properties, which collectively are expected to bring more than $4 million into the Receivership Estate. As outlined in the Receiver's prior Quarterly Reports, until sales begin to close, the Receiver anticipates that the Receivership will continue to be cash-strapped. In the event the Court grants this Fee

Application before any of these sales close, the Receiver will refrain from issuing payment until he is comfortable that the Receivership Estate will not be unduly prejudiced thereby.

The Receivership Order provides that "Quarterly Fee Applications ***may be subject*** to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court." RO ¶ 66 (emphasis added). Given the substantial reductions already taken (and outlined above), the Receiver once again respectfully requests that no holdback occur in this case. The SEC has indicated that it believes it would be appropriate to impose a holdback in the amount of 20% of the amount of fees and expenses for each quarterly fee application filed with the Court as described in the Order and in accordance with the SEC's standard receivership billing procedures. Again, however, the holdback is unnecessary here, where, for example, the Receiver has already voluntarily discounted his own fees by approximately 40% ($69,363.50 billed versus $114,620 if no discounts were applied).

In accordance with the Receivership Order, the attorneys for the Securities and Exchange Commission previously reviewed the invoices of the Receiver, Brown Fox, Ahuja & Clark, and Veracity and have no objection to the invoices.

## II.
## LEGAL DISCUSSION OF GUIDELINES FOR PAYMENT OF RECEIVERSHIP FEES AND EXPENSES

In reviewing the total fees (not including expenses) of the Receiver, the Receiver's counsel, and the Receiver's accountants for which approval is sought in this Application (collectively, $394,295.00), divided by the hours worked (1,575.60 hours), the lodestar average rate per hour is